***********
The undersigned have reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee/employer relationship existed between plaintiff and employer at all relevant times herein.
3. Continental Casualty Insurance Company was the carrier on the risk at all relevant times herein.
4. In addition, the parties stipulated into evidence the following:
a. E-mail from plaintiff dated February 18, 2002;
b. Note by plaintiff dated February 8, 2002;
c. Letter from Therese Shepherd dated December 1, 2000;
d. Plaintiff's discovery responses;
e. Left Work Form dated March 8, 2002;
f. Part of the attendance guidelines of defendant-employer;
g. Web advise sheet; and
h. Packet of medical records and reports.
5. The Pre-Trial Agreement, dated January 6, 2003, which was submitted by the parties before the Deputy Commissioner, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was thirty-one years old and a high school graduate. She began working for defendant-employer in November 1999 as a customer service representative. Her job involved taking telephone calls from customers, handling problems, opening new accounts and selling various services offered by the telephone company. She did not produce sufficient evidence to determine her average weekly wage.
2. In July of 2000, plaintiff sustained an injury, unrelated to her employment, which caused her to develop dizziness and nausea. On July 31, 2000, she sought treatment with Dr. Ballenger, a neurologist, and he diagnosed her with post — traumatic vestibulopathy, a disorder involving the balance mechanisms of the inner ear. He treated her with medication but, unlike most cases of the vestibulopathy, her condition did not improve significantly and she remained symptomatic, with somewhat variable symptoms. Due to plaintiff's sixty-mile commute to work from her home in Sneads Ferry to the office in New Bern, Dr. Ballenger's physician's assistant kept her out of work. However, Sprint sent her to another doctor who determined that she was capable of performing her job duties, so she was directed to report for work or face termination. Consequently, she returned to work the first week of November 2000.
3. The competent evidence in the record established that plaintiff's drive to work was very difficult due to her condition and she would experience severe migraine headaches and at times feel dizzy and nauseated and would have to pull off of the road in order to vomit. On November 29, 2000, plaintiff was feeling quite ill before leaving for work so she called Sprint's computerized leave system to take a vacation day. However, there were too many other employees taking off that day for the system to allow another absence, so her request was denied. Since plaintiff would face disciplinary action for failing to report for work under the circumstances, she drove to New Bern, having to pull over several times during the commute.
4. At some time after starting work that morning, plaintiff went upstairs to check the computer in the command center to see if she could go home. While on the second floor, she told Sheri Scott, a co-worker, that she was feeling very sick but that she could not go home due to company's leave policy. The two women decided to take a break and go outside for some fresh air. They began to walk down the stairway from the second floor to the first floor. As they turned on the landing at the middle of the stairway and stepped onto the first step of the lower section, plaintiff stated that she was feeling dizzy and she grabbed the railing. Before Ms. Scott could catch her, plaintiff then lost consciousness and fell face-forward down that flight of steps.
5. Ms. Scott immediately notified a security guard nearby of plaintiff's fall and he called an ambulance. Plaintiff was subsequently seen in the emergency room where she was conscious but not fully alert, and she was not able to give the emergency room physician's assistant a good history. There was a knot and an abrasion on her head in the occipital region. A CT scan was ordered and it showed the swollen area but no acute intracranial changes. The physician's assistant referred plaintiff back to her treating neurologist, Dr. Ballenger.
6. Ruthetta Echols, Dr. Ballenger's physician's assistant, examined plaintiff on December 15, 2000. Plaintiff reported head, neck, hip and right leg pain and said that her vertigo and nausea were much worse since the fall. Ms. Echols noted the presence of muscle spasms in plaintiff's neck and back. She ordered an EEG and kept plaintiff out of work. Plaintiff presented on December 28, 2000, and complained of persistent headaches, back pain and coccyx pain. Ms. Echols was of the impression that she had post-concussive headaches secondary to contusions from the fall. When the symptoms persisted, an additional diagnosis of myofascial syndrome secondary to head trauma was made. Plaintiff was treated with medication and physical therapy.
7. Prior to the injury in question, plaintiff was referred to the Vertigo Clinic at Duke Medical Center. On January 22, 2001, plaintiff was seen at the clinic by Dr. McElveen. He diagnosed her with benign positional vertigo due to an inner ear problem and recommended that she be treated with a Canalith repositioning procedure. By letter, dated January 29, 2001, Dr. McElveen advised Dr. Ballenger of his recommendations. However, it is unknown whether plaintiff ever received the procedure he proposed. Plaintiff continued to see Ms. Echols until March 26, 2001 and then did not return until July 23, 2001. In the meantime, she underwent gastric bypass surgery for reasons unrelated to her injury. At the July 23 appointment, plaintiff advised Ms. Echols that she was doing relatively well and thought that she was able to work and Ms. Echols released her to try to perform her job. Plaintiff returned to work on August 3, 2001 and performed her regular job duties until approximately February 1, 2002.
8. On April 23, 2001, while plaintiff was out of work after her fall, she was evaluated by Dr. Good, another neurologist, who had been asked to provide an independent medical examination. His relevant diagnoses included post concussion syndrome without obvious neurocognitive decline, post concussional migraine headaches, myofascial pain syndrome (although he could not rule out sciatica) and probable depression in association with chronic pain. He recommended that her medications be changed and that she do certain exercises. In his opinion, she was not capable of performing her regular job duties at that time.
9. Plaintiff resigned from her employment with defendant-employer effective February 1, 2002. Although she testified that her resignation was due to ongoing problems with headache and nausea, she did not produce any medical evidence addressing the issue of disability after that date or the cause of any such disability. Plaintiff had not returned to work by January 6, 2003, the date of the hearing before the Deputy Commissioner.
10. On November 29, 2000, plaintiff was at work at Sprint's insistence and contrary to the advice of her treating physician. While at the top of a flight of stairs and engaged in activity reasonably related to her employment, plaintiff lost consciousness due to preexisting vestibulopathy. Plaintiff's employment placed her at an increased risk of injury due to loss of consciousness. Plaintiff sustained an interruption of her normal work routine by the introduction of unusual circumstances when she fell down the stairs on November 29, 2000. Plaintiff developed post concussion syndrome with worsened vertigo and headaches, as well back and neck pain and spasms. The injuries she sustained required medical treatment and rendered her unable to work.
11. As a result of the injuries sustained in her fall on November 29, 2000, plaintiff was unable to work in any capacity from November 30, 2000 through August 2, 2001. Thereafter, plaintiff became capable of performing her regular job duties and earning her regular wages. She did not prove that she sustained any further disability as a result of her November 29, 2000 fall. There was no medical evidence establishing that she was unable to work and earn wages as of February 1, 2002, when she resigned from her employment with defendant-employer.
12. During the time plaintiff was out of work after her fall, she received short-term disability benefits from her employer in the amount of one hundred percent of her wages for five weeks and then fifty percent of her wages for the rest of the period. There was some testimony indicating that plaintiff paid a portion of the premiums for this benefit, but her wage stub information did not appear to show such a deduction. Therefore, the defendants shall receive a credit for the short-term disability benefits paid to plaintiff.
13. The evidence of record did not address whether plaintiff had reached maximum medical improvement with respect to the injuries she sustained in her fall.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff's fall on November 29, 2000, although due to preexisting vertigo, constituted an accident arising in the course of her employment since it was an unusual occurrence which happened at work on her employers' premises while she was engaged in activity related to her employment. Taylor v. Twin City Club, 260 N.C. 435 (1963); Harless v.Flynn, 1 N.C. App. 448 (1968).
2. An injury that is associated with a risk attributable to ones employment is compensable, even though the employee may suffer from an idiopathic condition that contributed or precipitated the injury, Hollarv. Montclair Furn. Co., 48 N.C. App. 489, 269 S.E.2d 667 (1980).
3. Since, by virtue of having to report to work notwithstanding plaintiff's illness, because too many other employees had taken off that day and the defendant/employer's attendance system would not allow plaintiff's absence and plaintiff would have faced disciplinary action had she failed to report to work, plaintiff was placed in a position which increased the dangerous effects of using the employer's stairs which resulted in plaintiff's fall due to an idiopathic condition, her injuries arose out of her employment. Taylor v. Twin City Club, 260 N.C. 435
(1963).
4. Consequently, on November 29, 2000 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6); Taylor v. Twin City Club,260 N.C. 435 (1963); Harless v. Flynn, 1 N.C. App. 448 (1968).
5. Plaintiff had the burden of proving both the existence of her disability and its degree. She did prove that she was temporarily totally disabled as a result of injuries sustained in the fall from November 30, 2000 through August 2, 2001. However, no further disability was proven. N.C. Gen. Stat. § 97-29; Hilliard v. Apex Cabinet Co., 305 N.C. 593
(1982).
6. As a result of plaintiff's compensable injury by accident, plaintiff is entitled to receive temporary total disability compensation from November 30, 2000 to August 2, 2001. Compensation due which has accrued shall be paid in a lump sum. N.C. Gen. Stat. § 97-29.
7. The totality of the evidence indicates that the plaintiff contributed no amount to premiums for her short-term disability. Therefore, assuming that the short term disability benefits plaintiff received during the period of her temporary total disability were fully funded by plaintiff's defendant/employer, defendants are allowed a credit for those weeks paid, as provided in N.C. Gen. Stat. § 97-42. N.C. Gen. Stat. § 97-42; Church v. Baxter Travenol Laboratories, Inc.,104 N.C. App. 411 (1991).
8. Plaintiff is entitled to have defendants pay for all medical expenses incurred or to be incurred as a result of the compensable injury of November 29, 2000 as may be required to provide relief, effect a cure, or lessen the period of disability. N.C. Gen. Stat. §§ 97-25; 97-25.1,97-2(19).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees hereinafter provided, defendants shall pay compensation to plaintiff for temporary total disability from November 30, 2000 to August 2, 2001. Compensation due which has accrued shall be paid to the plaintiff in a lump sum, subject to the attorney's fees hereinafter provided. Assuming full funding of the short term disability benefits she received during the time of her disability, defendants are allowed a credit for those benefits as provided above.
2. Defendants shall pay for all reasonably necessary medical treatment related to plaintiff's injury by accident for so long as such treatment tends to effect a cure, provide relief or lessen the period of disability.
3. An attorney's fee in the amount of twenty-five percent of the total compensation due for temporary total disability before any credit taken is approved for plaintiff's counsel and shall be paid by defendants from the reduction of credit for short term disability benefits previously paid to plaintiff.
4. Defendants shall pay the costs due the Commission.
This the ___ day of March, 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER